# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 242 | **DATE** | 3/25/2003 |
| **CASE TITLE** | Hyman vs. Tate | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons set forth on the attached Memorandum Opinion and Order, the Court finds that any FDCPA violation arising out of T&K's September 11, 2001 letter to Cheryl Hyman was the result of a bona fide error. Accordingly, the Court finds in favor of defendants Tate and Kirlin. Judgment is entered in favor of the defendants.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | MAR 2 6 2003 | |
| | Notified counsel by telephone. | | date docketed | 27 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | date mailed notice | |
| | | 03 MAR 25 PM 5: 13 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL HYMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02 C 242 |
| v. | ) | |
| | ) | |
| DICK TATE and HARRY KIRLIN, | ) | |
| d/b/a TATE & KIRLIN | ) | |
| ASSOCIATES, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

DOCKETED

MAR 2 6 2003

MATTHEW F. KENNELLY, District Judge:

Tate & Kirlin Associates, a collection agency, sent a collection letter to Cheryl Hyman,

who, unbeknownst to T&K, had filed a petition for protection in the United States Bankruptcy

Court. Because of that letter, Hyman sued Dick Tate and Harry Kirlin, who together operate

T&K, alleging violations of the Fair Debt Collection Practices Act. After denying cross motions

for summary judgment, the Court held a bench trial on February 28, 2003. This memorandum

opinion and order sets forth the Court's findings of fact and conclusions of law in satisfaction of

Rule 52 of the Federal Rules of Civil Procedure.

**Findings of Fact**

On January 14, 2000 Cheryl Hyman filed a Chapter 13 petition in the United States

Bankruptcy Court for the Northern District of Illinois. The list of debts attached to her petition

included a $437.61 debt owed to Cross Country Bank (CCB) for credit card purchases. As a

listed creditor, CCB received notice of the bankruptcy case in late January 2000; the bankruptcy

court also sent notice to Simms Associates, which was a collection agency apparently working Hyman's account for CCB at the time. The bankruptcy court confirmed Hyman's Chapter 13 Plan on May 18, 2000; on September 6, 2001, the court entered a corrected order confirming the plan. Under the terms of the plan, Hyman was to pay 100% of her secured and unsecured claims over a period of 36 months.

On September 7, 2001, CCB referred Hyman's account to Tate & Kirlin Associates for collection. On September 11, 2001, T&K sent Hyman a letter seeking to collect the debt owed to CCB. The letter offered Hyman two options to help her satisfy her account: a "reinstatement program," which required Hyman to pay the debt in full in exchange for CCB issuing a new credit card with a new line of unsecured credit, and a "settlement program," which allowed Hyman to close the matter for $256.57. The letter advised Hyman that she had the right to dispute the validity of the CCB debt and that she had the right to request and obtain verification of the debt. A few weeks after she received the letter, Hyman called T&K to report that she had filed for bankruptcy protection. The collector who took Hyman's call asked her some follow-up questions (the case number, the chapter under which Hyman had filed her petition, and the name of her attorney) and then took the necessary steps to close Hyman's account. T&K made no further attempts to collect on Hyman's account and officially closed it on November 21, 2001.

On January 10, 2002, Hyman sued Dick Tate and Harry Kirlin, d/b/a Tate & Kirlin Associates, alleging violations of the Fair Debt Collection Practices Act. Specifically, Hyman alleges that the defendants violated §§1692e and f of the FDCPA, because attempting to collect a debt that was subject to a pending bankruptcy is both false, deceptive or misleading (as prohibited by 15 U.S.C. §1692e), and unfair and unconscionable (as prohibited by 15 U.S.C.

2

§1692f). In her complaint, Hyman also alleged that the defendants violated §1692c(a)(2) of the FDCPA when it sent her the letter even though she was represented by an attorney; shortly before trial, Hyman withdrew this claim, leaving only the §§1692e and f claim.

On July 19, 2002, the bankruptcy court entered an order discharging Hyman from her debts; the bankruptcy case was closed on August 2, 2002.

## Conclusions of Law

A.    The Impact of *Cox*

As an initial matter, we consider whether Hyman is entitled to pursue an FDCPA claim in this court. In response to a cursory argument by T&K in its motion for summary judgment, the Court briefly considered whether Hyman's claims were precluded by the Bankruptcy Code. We recognized that *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 915-16 (7th Cir. 2001), requires certain types of claims to be brought in the bankruptcy court, not in the district court. *Hyman v. Tate & Kirlin*, No. 02 C 242 (N.D. Ill. Nov. 1, 2002). But we also recognized that Hyman's claim was different from the claim raised in *Cox*, and we therefore declined to close the door on Hyman, especially because T&K made no effort to explain how the differences in the claims would, or should as a practical matter, affect our analysis. *Id.* Relying on a recent district court decision that appears to be directly on point, T&K again raised the issue during closing arguments at trial, and we therefore think it prudent to delve a bit deeper into the question of whether this case should even be here.

*Cox* involved a debtor who, after filing a voluntary petition for bankruptcy, signed a reaffirmation agreement covering a debt he owed to Zale for a ring he had purchased on credit. Zale failed to file the reaffirmation agreement with the court, which, under §524(c) of the

3

Bankruptcy Code, 11 U.S.C. §524(c), is a necessary prerequisite for making the agreement valid and enforceable. As a result, when the bankruptcy court entered its discharge order, Cox's Zale debt was discharged along with the rest of his non-reaffirmed debts. Nevertheless, Cox paid off the debt, consistent with the reaffirmation agreement. He later filed a class action suit in district court, alleging violations of 11 U.S.C. §524(c); 11 U.S.C. §524(a)(2), which enjoins actions to collect a discharged debt; 11 U.S.C. §362, concerning the automatic stay of collection efforts that applies during a pending bankruptcy case; and various state law theories (but no FDCPA claim). *See Cox v. Zale Delaware, Inc.*, No. 97 C 4464, 1998 WL 397841, at *1 (N.D. Ill. July 13, 1998). The district court held that the §524 claims could be brought only in bankruptcy court, and it dismissed the state law claims as preempted by the Bankruptcy Code's §524 remedy; it dismissed the claim for violation of the automatic stay "in the exercise of . . . judicial discretion," believing it more efficient for the bankruptcy court to deal with that claim too. *Id.* at *5.

On appeal, the Seventh Circuit was not asked to deal with the automatic stay issue. On the §524 claims, the court held that §524(c), which lists the requirements for a valid reaffirmation agreement, does not create an action for damages and that a suit for violation of that section can be brought only as a contempt action under §524(a)(2) of the Code, which enjoins any action to collect or recover a discharged debt. *Cox*, 239 F.3d at 913-14, 917. In reaching this conclusion, the court first cited with approval two cases holding that "remedies against debt-affirmation agreements contended to violate the Bankruptcy Code are a matter exclusively of federal bankruptcy law." *Id.* at 913 (citing *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 426 (6ᵗʰ Cir. 2000); *Bessette v. Avco Financial Services*, 230 F.3d 439, 447-48 (1ˢᵗ Cir. 2000)). Thus Cox, who sought to rescind the reaffirmation agreement, was required to sue in the

4

bankruptcy court for violation of §524(a)(2)'s injunction against collection activity on discharged debts; that remedy, the court held, was exclusive and rightfully so, as it "plac[ed] responsibility for enforcing the discharge order in the court that issued it." *Cox*, 239 F.3d at 916. This made sense, according to the court, because the court that issued the discharge order was in a better position than the district court "to adjudicate the alleged violation, assess its gravity, and on the basis of that assessment formulate a proper remedy." *Id.*

*Peeples v. Blatt*, No. 00 C 7028, 2001 WL 921731 (N.D. Ill. Aug. 15, 2001), presented a situation similar to *Cox*. The plaintiffs signed "redemption agreements," pursuant to which they agreed to keep paying for merchandise they purchased from Sears on credit even though their debts to Sears had been discharged in bankruptcy. In exchange, Sears agreed to let them keep the merchandise. Sears, however, never filed the agreements with the bankruptcy court. The plaintiffs sued Sears, alleging violations of both the Fair Debt Collection Practices Act and the discharge injunction contained in §524(a)(2) of the Bankruptcy Code. Sears moved to dismiss the complaint, arguing among other things that, under *Cox*, the plaintiffs' exclusive remedy was in the bankruptcy court. *Id.* at *4. The district court disagreed because "*Cox* did not discuss the issue of whether the Bankruptcy Code precludes actions based on other federal statutes, such as the FDCPA. *Cox* held that the Bankruptcy Code preempted state law claims premised on violations of the Code." *Id.* Based on this, the court denied the motion to dismiss and allowed the plaintiffs' FDCPA claim to proceed; the court dismissed the claim for violation of §524, however, recognizing that under *Cox* the sole remedy for such a violation is a contempt action in the bankruptcy court. *Id.* at *5.

*Bolen v. Bass & Associates*, No. 97 C 3944, 2001 WL 1249058 (N.D. Ill. Oct. 17, 2001),

5

also involved a reaffirmation agreement. As in *Cox* and *Peeples*, the plaintiff had filed for

bankruptcy protection but signed a reaffirmation agreement so that she could keep a refrigerator,

stove and VCR she had purchased on credit from Best Buy. Best Buy never filed the

reaffirmation agreement with the bankruptcy court, and the agreement was therefore

unenforceable. Despite this, Best Buy's representative took steps to collect payments under the

agreement, and Bolen sued, alleging that by seeking to collect on a debt that had been discharged

in bankruptcy, the representative, Bass & Associates, violated §§1692e and f of the FDCPA.

Bass moved for summary judgment, arguing that the district court lacked jurisdiction to decide

the claim because, under *Cox*, the claim could only be pursued in the bankruptcy court. The

district court agreed "in light of the direct holding in *Cox* 'that a suit for violation of section

524(c) can be brought only as a contempt action under section 524(a)(2). . . .'" *Id.* at *3. The

court rejected the claim, in large part, because allowing Bolen's claim – which was predicated on

the creditor's failure to satisfy its obligations under §524(c) of the Bankruptcy Code – to proceed

in the district court would send the wrong message: it could "deter[] creditors from protecting

their rights under 524(c)" and spur debtors "to disregard their obligations once they have agreed

to reaffirm a debt," *id.*, both of which would substantially undermine the Bankruptcy Code's

reaffirmation provisions.

The direct holding of *Cox*, as recognized in *Peeples* and *Bolen*, is "that a suit for violation

of section 524(c) can be brought only as a contempt action under sections 524(a)(2)." *Cox*, 239

F.3d at 917; *Bolen*, 2001 WL 1249058, at *3; *Peeples*, 2001 WL 921731, at *4. But this case

does not involve a reaffirmation agreement, and Hyman is not alleging a violation of §524(c).

Moreover, when T&K sent the September 11, 2001 letter to Hyman, the bankruptcy court had not

6

yet issued its discharge order, which means that a contempt action under §524(a) was not an option for Hyman. Hyman is not alleging a violation of any Bankruptcy Code provision or any bankruptcy rule; her claim arises entirely under the FDCPA – not simply because she cited the Act in her complaint, but because substantively, that is where her allegations legitimately fall. *Cox* is not so broad that it can fairly be read to exclude from the district court's jurisdiction every claim that even remotely touches upon issues arising out of a bankruptcy petition.

In *Randolph v. IMBS, Inc.*, --- B.R. ----, No. 02 C 6368, 2003 WL 253158 (N.D. Ill. Feb. 4, 2003), a case involving pretty much the same facts as our case, the court reached the opposite conclusion, and, not surprisingly, T&K urges us to follow its example. Randolph, like Hyman, received a collection letter on a debt that was listed in her bankruptcy petition, and Randolph, like Hyman, sued the collection agency alleging violation of the FDCPA. The agency moved to dismiss, and the court granted the motion. The court first noted that the collection activity about which Randolph complained unquestionably violated the bankruptcy court's automatic stay provision and that Randolph could have pursued a contempt action in that court. *Id.* at *1. The court then noted that in *Cox*, the Seventh Circuit "appeared to express a preference for resolving discharge-related issues in the Bankruptcy Court." *Id.* Based on this, the court concluded that Randolph had to proceed in the bankruptcy court. *Id.*

This case, like *Randolph* but unlike *Cox*, involves a violation of the automatic stay provision of the Bankruptcy Code, not the discharge injunction at issue in *Cox*. Despite this, the case does, to be sure, have some features similar to *Cox*: the Bankruptcy Code provides its own specific remedy for violation of the automatic stay, *see* 11 U.S.C. §362(h); *Aiello v. Providian Financial Corp.*, 239 F.3d 876 (7th Cir. 2001), and there is something to be said for the

7

proposition that, as in *Cox*, the court from which the stay issued "is in a better position to adjudicate the alleged violation, assess its gravity, and on the basis of that assessment formulate a proper remedy." *Cox*, 239 F.3d at 916.

But one important distinction between this case and *Cox* gives us pause: here, unlike *Cox*, we are being asked to preempt a federal, non-bankruptcy statutory remedy. In this regard there is some tension between what the court in *Randolph* characterized as the Seventh Circuit's "apparent preference" for a bankruptcy court remedy and its *stated* preference to avoid "repeal by implication" of a federal statute. *See United States v. Palumbo Brothers, Inc.*, 145 F.3d 850, 862 (7th Cir. 1998). *Randolph* does not deal with this distinction, and as was the case with its summary judgment motion, T&K has done nothing to attempt to address the distinction's significance. So as we did in denying summary judgment, the Court declines to rule in T&K's favor on this basis, particularly because T&K prevails on other grounds, as shall be seen shortly.

B.    The Merits of the Claim

We turn to the merits of Hyman's FDCPA claim. T&K argues first that Hyman failed to prove any violation of the FDCPA. And even if she did prove a violation, T&K argues, any violation was a *bona fide* error and therefore cannot subject T&K to liability under the Act. We consider each argument in turn.

1.    The FDCPA Violation

Section 1692e of the FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. §1692e. Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt." *Id.* §1692f. Hyman's claim against T&K is based solely

8

on the September 11, 2001 letter. This was T&K's only attempt to collect the CCB debt, and it is

undisputed that after Hyman called, T&K immediately took the necessary steps to close Hyman's

account and ensure that no further contact was made. Hyman argues that this one contact is

enough to prove an FDCPA violation. T&K argues that a collector essentially gets one free pass,

and that the FDCPA worked in this case exactly as it is designed to work: T&K made a single

attempt to collect what it thought was a valid debt; the debtor advised it that the debt, in fact, was

not valid, and it then ceased all activity.

To support its position, T&K cites *Jang v. A.M. Miller & Associates*, 122 F.3d 480 (7th

Cir. 1997), a case that is similar to Hyman's only in the sense that it involved a single collection

letter. The plaintiffs in *Jang* each received a dunning letter concerning debts owed to Discover

Card. The letters mirrored the language required by §1692g(a) of the FDCPA concerning the

debtor's right to dispute the validity of the debt and to request and obtain verification thereof.

The letters also stated, consistent with §1692g(b), that if the debtor made such a request, the

collector would cease collection activity until it verified the debt. (As an aside, though they are

not at issue here, Hyman's letter contained these same provisions.) After receiving the letters,

the plaintiffs disputed the validity of the debts and requested verification thereof. But the

collectors never provided the verification information. The collectors did, however, cease all

collection activity on the plaintiffs' accounts. Nevertheless, the plaintiffs sued, alleging that the

collectors violated §§1692e and f of the FDCPA because they never intended to provide the

verification information as they said they would in the dunning letters. The collection agencies

moved to dismiss, and the district court granted the motion. The Seventh Circuit affirmed the

dismissal. It ruled that even if the collectors had no intention of providing the verification

9

information, the statute required only that they cease all collection activity until they provided

such information, and the collectors did, in fact, do so. In other words, "[t]he inconsistency, to

the extent there was one, between what was promised in the letters and what the Agencies

actually did is expressly allowed by the statute." *Id.* at 484.

Our case is different from *Jang* in that Hyman has no quarrel with what T&K did *after*

she called to dispute the debt; Hyman challenges T&K's decision to send the dunning letter in

the first place. But there is some language in *Jang* to suggest that the same result would apply

here as well. After noting that §1692g anticipates the possibility that a debt may not be

verifiable, the court stated:

> After all, in the real world, creditors and debt collectors make mistakes, and
> sometimes initiate collection activities against persons who do not owe a debt.
> When a collection agency cannot verify a debt, the statute allows the debt
> collector to cease all collection activities at that point without incurring any
> liability for the mistake.

*Jang*, 122 F.3d at 483. For present purposes, however, we need not definitively answer the

question of whether this mistake exception means what T&K says it does. Even if we assume

that Hyman has established a violation of the FDCPA, under the circumstances, as we explain

below, we find that T&K may not be held liable for any such violation.

2.      T&K's *Bona Fide* Error Defense

Under the FDCPA's "*bona fide* error" defense, T&K is not liable if it can show "by a

preponderance of the evidence that the violation was not intentional and resulted from a *bona*

*fide* error notwithstanding the maintenance of procedures reasonably adapted to avoid any such

error." 15 U.S.C. §1692k(c). The parties have agreed that T&K did not know about Hyman's

bankruptcy petition when it sent the September 11, 2001 letter. Thus, the violation was

10

unintentional. The parties disagree, however, with respect to the second element of the bona fide error defense: Hyman alleges that T&K had *no* procedures in place to prevent what happened to Hyman; T&K defends its procedures as being reasonable.

At trial, counsel for Hyman argued that there were several things T&K could have done to check the status of Hyman's account *before* sending the initial dunning letter. It could have, for example, searched the bankruptcy court records; it could have pulled her credit report; it could have used Banko (an online national bankruptcy database), or some other skip tracing service. Any one of these measures would have revealed that Hyman had filed a bankruptcy petition and that her CCB debt was therefore not subject to collection. T&K had no mechanism in place to check, before-the-fact, for bankruptcy filings, and it made no inquiry as to the debtor's status before sending the initial letter. Instead, counsel argued, T&K hid its head in the sand, dealing with the issue only when – and if – the debtor raised it. According to the plaintiff, T&K's failure to take steps to determine the legal status of her debt before sending the letter necessarily means that T&K did not maintain procedures reasonably adapted to avoid the type of error that occurred here.

In response, T&K called Gerard Smith to testify. Smith is T&K's general manager, handling the day-to-day operations of the company, developing plans for which accounts will be "worked" and how they will be worked, reviewing collectors' reports with managers, and serving as the main contact for clients, the creditors who turn over delinquent accounts to T&K for collection activity. Smith testified that Cross Country Bank, the creditor for whom T&K sent the letter involved in this case, is T&K's biggest client, both in terms of dollars collected and in terms of the number of accounts served; CCB accounts for approximately forty-five percent of

11

T&K's revenue and sixty percent of T&K's accounts. Smith further testified that he communicates with representatives of CCB several times each week, and sometimes several times a day.

Smith testified concerning the steps T&K takes to train its collectors to ensure compliance with the FDCPA and other state and federal laws. With regard to the matters at issue here, Smith testified that T&K instructs its collectors that once they learn a debtor has filed for bankruptcy, all collection activity must stop. T&K instructs its collectors to obtain from the debtor basic information concerning the bankruptcy, including the chapter of the Bankruptcy Code under which the debtor filed and the name of the debtor's attorney, and then to remove the debtor's address and telephone number from T&K's computer records so that no further letters will be mailed and no further calls will be made on the account. The account is then sent to the support desk within T&K, which officially closes the account.

Smith testified that T&K learns about a bankruptcy filing from one of three sources: either the bankruptcy court sends a notice or letter, the debtor calls or writes to report it, or the creditor client calls T&K to pass on the information. On cross examination, he admitted that T&K is entirely passive in this information exchange; it takes no preemptive steps to determine whether a debtor has filed a bankruptcy petition before it sends the letter. Rather, Smith stated, T&K relies on its client, the creditor, not to send accounts that are in bankruptcy. It does not make sense for a creditor to do so, Smith testified, because it is not good business practice – from which we take Smith to mean that a creditor has no good reason to send accounts for collection where no debt is legally due.

Smith admitted that T&K does not search the bankruptcy court's records; it does not use

12

Banko, an online research service that cross checks a debtor's name, address, phone number or social security number against bankruptcy filings; and it does not routinely run credit reports for debtors. Smith conceded that T&K never really even contemplated taking any of these steps; he stated that he did not understand such measures to be required under the law. Smith also testified that cost could be a concern because of the volume of accounts T&K handles. For example, pulling a credit report for any particular debtor would cost T&K $1.50 per account, a bulk rate that applies if T&K makes at least 5,000 requests per month, and T&K handles roughly 80,000 accounts per month. To request a report on every account would cost T&K $120,000 per month, or nearly $1.5 million per year.

On cross examination, Smith also admitted that he did not know whether CCB took any affirmative steps to determine whether a debtor had filed for bankruptcy. He conceded that CCB, which certainly *reports* information to credit bureaus, would have the ability to *get* information from the same entities. He testified that, to his knowledge, CCB did not run credit reports, check bankruptcy court records or enlist a service such as Banko before referring an account for collection.

Smith testified that it was "bad business" for clients to refer bankrupt accounts because neither T&K nor the client could get any money out of them. He also testified that it was "understood" that CCB would not refer such accounts to T&K, though on cross examination he admitted that nothing in the contract governing the relationship between T&K and CCB specifically prohibits such referrals. He also conceded that he had never specifically discussed the issue with anyone at CCB and that no one at CCB actually told him they would refrain from sending over accounts on which a bankruptcy petition had been filed. Finally, Smith conceded

13

that clients have on occasion previously referred accounts on which a bankruptcy petition has been filed and that he never followed up to figure out how or why that happened. Smith testified that this happened very infrequently, less than 100 times per year on the nearly 1,000,000 accounts T&K handles annually.

Counsel for Hyman repeatedly emphasized at trial that T&K's procedures, as explained by Smith, kick in only *after* some outside source brings information to T&K's attention, and that those procedures do nothing to prevent the injury at issue here. Both propositions are true. T&K's procedures admittedly cause it to send dunning letters to debtors whose cases are in bankruptcy perhaps eight times per month. The issue, however, is whether the procedures T&K follows – reliance on its creditor not to refer debtors who are in bankruptcy, and immediate cessation of collection efforts once T&K learns of a bankruptcy filing – are reasonable. We find that they are.

We agree with Hyman's attorney that T&K had various tools at its disposal that would have enabled it to ascertain, before sending the September 11 letter, whether Hyman had filed for bankruptcy or whether the debt it sought to collect was in fact valid. But assessment of the reasonableness of T&K's procedures involves more than asking whether it could do more. We have to take into account the likelihood of a violation and the cost of any such violation, both in terms of dollars and in terms of the potential harm to be inflicted by any such violation. According to Smith, what happened to Hyman happens fewer than 100 times a year. T&K handles almost a million accounts each year (Smith testified that T&K handles more than 80,000 accounts per month, which would put their annual load in excess of 960,000 accounts). In other words, the particular violation at issue here occurs less than one one hundredth of one percent (or

14

.01%) of the time. That is not a bad statistic for a relatively innocuous violation. The harm at issue here, based on receiving one misleading letter, consists at most of some minor confusion lasting a brief period of time. The letter specifically instructed Hyman that she had the right to dispute the debt; she did, and that ended the matter – because of T&K's procedures.

Nor do we find it unreasonable that T&K relied on an informal understanding with its clients that they would not refer accounts on debts that were the subject of a bankruptcy petition. Although T&K would have been prudent to insist on such a provision in its agreement with CCB, we cannot say that it was unreasonable for it not to do so – especially where the evidence shows that referrals of such accounts were so rare in the scheme of things. In other words, the parties' implicit understanding almost always worked to prevent FDCPA violations. T&K's decision to proceed as it did was reasonable, even if, in a tiny percentage of cases, it sent a letter that technically violated the FDCPA – especially because T&K had other procedures in place to remedy the violation immediately upon learning that it had occurred. As Hyman can attest, those procedures work.

## CONCLUSION

For the reasons explained above, the Court finds that any FDCPA violation arising out of T&K's September 11, 2001 letter to Cheryl Hyman was the result of a *bona fide* error. Accordingly, the Court finds in favor of defendants Tate and Kirlin. The Clerk is directed to enter judgment in favor of the defendants.

Date:   March 24, 2003

MATTHEW F. KENNELLY
United States District Judge

15